## Case No. 5,936.

### HALL et al. v. HURLBUT.

[Taney, 589.] [1]

Circuit Court, D. Maryland. April Term, 1858.

ADMIRALTY—CHARTER-PARTY—MASTER OF VESSEL NOT A COMPETENT WITNESS WHEN INTERESTED ON PROFITS—DAMAGES FOR DELAY.

1. On the 21st of September, 1854, the libellants, who were residents of Boston, chartered their vessel, then in the port of New York, to the respondent, for a voyage from the port of Franklin, in Louisiana, to Baltimore; the respondent to load her with sugar and molasses, as specified in the charter-party, and upon the freight therein mentioned; the charter to commence when the vessel was ready to receive cargo at the place of loading, and notice thereof given to the charterer or his agent. The charter-party contained a provision that the vessel was to have the privilege of proceeding to a southern port, and load a cargo of lumber for the West Indies, and on the discharge of the cargo, to proceed direct to Franklin; under this provision, the owners, on the 23d of September, while the vessel was still at New York, chartered her to another person, for a voyage from Wilmington, in North Carolina, to Basseterre, in the island of Guadeloupe, with a load of lumber. She sailed from New York on the 4th of October, arrived at Wilmington on the 8th of October, and sailed thence on the 2d of November, with a cargo of lumber for Basseterre; on the 5th of November, she was overtaken by a storm, and compelled to put into Nassau for repairs, and was detained there till the 4th of February, 1855; on that day, she sailed for Basseterre, and after discharging her cargo, sailed thence for Franklin, and arrived at Pattersonville, a few miles below Franklin, on the 13th of April, 1855. As soon as she arrived, the master called on the consignee, who was the agent of the respondent, and asked for his cargo; the agent told him he had no cargo, but would see if he could get one, and the master then commenced getting ready to take the cargo on board; in a few days, he notified the agent that the ship was ready to receive cargo, to which he replied, that he did not think the charter-party binding, and that he had no cargo for him; after receiving this answer, the vessel remained six or seven days at Pattersonville, and then sailed for Baltimore. By the terms of the charter-party the respondent was entitled to twenty running days to load the vessel, but she did not remain at Pattersonville more than half that time, and sailed for Baltimore in consequence of the answer received from the consignee: but for the delay at Nassau, the vessel would have arrived at Franklin during the usual season for shipping sugar and molasses from that region, which commences in November, and was proved by some witnesses to end by the 1st of March, and by others to continue during that month; and with regard to the delay at Nassau, the persons who surveyed the vessel when she arrived there, and those who repaired her, and assisted in landing her cargo, and in reshipping it, and fitting her to sail again, were examined, and testified that there was no unnecessary delay.

2. On libel filed in the admiralty by the owners of the vessel, against the charterer, to recover

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

damages for the refusal to furnish the vessel with cargo: *Held,* that although there was no stipulation as to the time of sailing from New York, or as to the time to be consumed in the intermediate voyage, the law implied a covenant on the part of the ship-owners, that she would proceed to the port of destination with convenient speed, and use reasonable and proper exertions to reach it as early as practicable.

3. If the vessel wasted more time than was necessary in the intermediate voyage, or at any of the ports she entered, whether in repairing, or receiving or delivering cargo, the owners have no right to complain of a failure on the part of the shipper to furnish her with a cargo, if his inability to do so were caused by such unnecessary waste of time.

4. The circumstances above stated indicate no want of proper diligence on the part of the owners, or the master.

5. In the absence of any fault on their part, the unusual delay of the vessel, and her arrival at the port where she was to take in cargo, after the season for shipping it had gone by, did not release the charterer from the obligation to furnish the cargo stipulated for by the charter-party.

6. In considering the question of delay for repairs at Nassau, no comparison ought to be made between the time occupied at Nassau, and the time that would be occupied in similar work in Baltimore, because the time required must depend upon the facilities which the port affords for landing and reshipping cargo and repairing damages.

7. Where the charter-party contains no stipulation that the vessel shall arrive at the port of shipment by a particular day, the shipper takes the risk of delay or detention by any superior force which the vessel could not resist or overcome.

8. The omission of the vessel to remain at Franklin the number of lay-days mentioned in the charter-party, after the master had been informed that a cargo would not be furnished, and the binding effect of the contract was denied, is no bar to the libellant's claim.

9. The fact that in making charter-parties for the sugar and molasses trade, it is the usage to make them with reference to the season, cannot affect the legal construction of the written contract.

10. In a case like the present, at common law, the plaintiffs would be entitled to recover the full amount of freight that would have been earned if the cargo agreed on had been furnished.

11. But in an admiralty proceeding, where the equity as well as the law of the case is before the court, the omission to give notice of the disaster which detained the vessel so long beyond her time, must exercise a serious influence in estimating the damages which the libellants are justly and equitably entitled to, and throw upon them a portion of the loss occasioned by such omission.

[Cited in Watts v. Camors, 115 U. S. 361, 6 Sup. Ct. 94.]

12. The master of the vessel was incompetent to testify to there having been no unnecessary delay in the voyage; because by contract with the owners he was to have half the gross profits of the voyage, and man and victual the ship, and pay half the port-charges, and therefore was interested in the result of the suit.

13. His becoming disabled, and employing another master to complete the voyage, did not render him competent, as it did not release him from the obligation to man and victual the vessel for the residue of the voyage; the person employed by him to act as master being merely his substitute and agent, for whose wages he

would be responsible; and he, and not his substitute, being entitled to one-half the gross profits.

[Appeal from the district court of the United States for the district of Maryland.

[This was a suit in admiralty by Isaac C. Hall, James H. Myrick, and others against Samuel Hurlbut.]

S. T. Wallis and R. S. Matthews, for appellants.

David Stewart and John Stewart, for appellee.

TANEY, Circuit Justice. This is a case of some difficulty, arising from circumstances which obviously were not contemplated on either side, when the charter-party was executed. These unforeseen circumstances have disappointed the expectations of both parties, and the question is, who must bear the loss? The charter-party was executed at New York, on the 21st of September, 1854; the owners live in Boston, to which port the vessel belongs; and the charterer resides in Baltimore; the vessel was then lying in the port of New York. The owners, by their duly authorized agent, agreed to charter and freight the brig Monte Christo to the respondent, for a voyage from the port of Franklin, in Louisiana, to Baltimore; the respondent to load her with sugar and molasses, as specified in the charter-party, and upon the freight therein mentioned; the charter to commence when the vessel was ready to receive cargo at her place of loading, and notice thereof given to the charterer or his agent. There is a further provision in the instrument, that the vessel was to have the privilege of proceeding to a southern port, and load a cargo of lumber for the West Indies, and on the discharge of the cargo, to proceed direct to Franklin. Under this last-mentioned stipulation, the owners, on the 23d of September, while the vessel was still in New York, chartered her to another person, for a voyage from Wilmington, in North Carolina, to Basseterre, in the island of Guadeloupe, with a load of lumber.

The brig proceeded on this last-mentioned voyage, and after taking on board a cargo of lumber, sailed for Basseterre, on the 2d of November; on the 5th of November she encountered a storm, and suffered so much that it became necessary to put into Nassau to repair the damage. Upon her arrival at Nassau, the brig, upon survey, was found to be so much injured from the storm, that it was necessary to land her cargo, in order to make the repairs required to fit her for the sea; this was accordingly done, and the proper repairs made, and the cargo again placed on board; but she did not leave Nassau for Basseterre, until the 5th of February, 1855. She then proceeded on her voyage without further accident, and after discharging the lumber at her port of destination, she sailed directly for Franklin, and arrived at Pattersonville, a few miles below Franklin, on the 13th of April 1855; she was pre-

vented from going up to Franklin by the shallowness of the water. Wood, the master, who made the charter-party, because sick at Nassau, and was unable to proceed further, and Robert Dorritie, a competent ship-master for the voyage, was employed by Wood to take his place, with the approbation of the American consul. As soon as the brig arrived at Pattersonville, Dorritie called on Edwin Walters, to whom the brig was consigned, and who was the agent of Hurlbut, the respondent, presented his charter-party, and asked for his cargo; Walters answered, that he had no cargo, but would try and see what cargo he could get, to give him to Baltimore; Dorritie thereupon landed his ballast, to be ready to receive cargo. Some two or three days afterwards, Walters went to New Orleans, and returned in five or six days; and upon his return, Dorritie informed him his vessel was then ready to take the cargo on board; to which Walters replied, that he did not think the charter-party binding, and he had no cargo for him. After receiving this answer, Dorritie remained six or seven days at Pattersonville, and then sailed for Baltimore, where he arrived about the latter end of April or beginning of May, 1855.

By the terms of the charter-party, the respondent was entitled to twenty running days to load the vessel, and it is admitted, she did not remain at Pattersonville, ready to receive cargo, more than about half that time, and sailed for Baltimore in consequence of the answer received from the consignee. Before he sailed, Dorritie made a formal written demand upon the agent for the cargo, and upon receiving the answer above mentioned, made his protest, which substantially agrees with his testimony as given under the commission. Indeed, the agent for the respondent, in his testimony, agrees in all material respects with the testimony of the master as to what passed between them.

It will be seen by this statement, that nearly seven months elapsed after the charter-party was signed, before the brig arrived at Franklin, where the cargo was to be furnished and the charter to commence. I speak of her arrival at Franklin, because I regard her stoppage at Pattersonville as substantially the same thing; she was stopped, in the first instance, by the want of water in the river, and after the master's interview with Walters, he was absolved from the necessity of going there, as there was no cargo to be shipped.

It appears by the proofs in the case, that the voyages mentioned in the two charter-parties, which occupied nearly seven months, ought to be performed in about two, where proper preparations and efforts are made, and no accident interrupts them. And the first inquiry is, whether this unusual delay was occasioned by the negligence or the want of proper exertions on the part of the vessel; for although there is no particular stipula-

tion as to the time the brig should sail from New York, or as to the time she might consume in the intermediate voyage, the law implies a covenant on the part of the ship-owner, that he will proceed to the port of destination, with convenient speed, and use reasonable and proper exertions to reach it as early as practicable. And if the Monte Christo wasted more time than was necessary, in the intermediate voyage, or at any of the ports she entered, whether she was repairing, or receiving or delivering cargo, the libellants are not entitled to recover; for they have no right to complain, if the inability of the merchant to furnish a cargo was occasioned by the non-performance on their part of the condition precedent.

In determining whether reasonable and proper exertions were made by the ship, it is proper to say, that I put aside the testimony of Captain Wood, as he is clearly interested in the issue of this suit; he states, that by his contract with the owners, he was to have half the gross profits, and to man and victual the ship, and pay half the port-charges. He says he expects nothing; that may be very true, for it is probable that the expenses of manning and victualling the ship, and employing the master, will consume more than one-half the gross profits, even if the libellants succeed to the full amount of their claim. But his inability to hold the command and proceed on the voyage, certainly did not, by operation of law, dissolve the contract or release him from the obligation to man and victual the vessel for the residue of the voyage; and it is evident, that there was no agreement between him and the owners to dissolve it. On the contrary, he (as it was his duty to do, under the circumstances) employed Dorritie, and agreed with him as to his wages, and Dorritie was nothing more than his substitute and his agent, and for whose wages Wood was responsible; and Wood, and not Dorritie, was entitled to one-half the gross amount of the freight. His contract with the ship-owners was in full force, and he has a direct interest in the issue of this suit, and is incompetent as a witness.

But putting aside his testimony, I think that the libellants have shown that reasonable and proper exertions were made by the brig, and that it does not appear that the delay was occasioned by any neglect of duty on her part, but by circumstances beyond the control of the master and crew.

It is true, that although the charter-party was executed on the 21st of September, she did not leave the port of New York until the 4th of October. But there is no covenant by the ship-owners that she should sail with convenient speed on the voyage contemplated, nor even a covenant that she is ready for sea; it is merely stated, that she was lying in the port of New York at the time, and that the owners had the privilege of entering into another charter-party for an intermediate voyage. She required time to make this second

agreement; and after it was made, naturally required time to prepare and equip the vessel for these two voyages; the period between the 21st of September and the 4th of October, in the absence of any proof to the contrary, can hardly be regarded as proof of negligence or waste of time.

She arrived at Wilmington on the 8th of October, where she took in the lumber and sailed for Basseterre on the 2d of November; on the 5th, she was overtaken by a storm, and compelled to put into Nassau to repair and refit, where she arrived on the 12th, and did not leave that port for Basseterre until the 4th of February, 1855, as I have already stated. Up to the time of her arrival at Nassau, the log-book contains a history of her proceedings; and the court see nothing in them of which the respondent has a right to complain. The stay in Wilmington, in receiving and taking in the cargo, does not appear to have been prolonged by the fault or negligence of the master of the vessel; nor indeed, does the charter-party with the respondent require the vessel to use any extraordinary exertions to shorten the time to be occupied in the intermediate voyage. She sailed for Basseterre, from Wilmington, on the 2d of November, and if no casualty had happened, she had abundant time to reach Franklin, long before the usual season for shipping sugars and molasses was over. The delay at Nassau, however, was a very prolonged one, and it is incumbent on the libellants to show that it was not occasioned by the default of the master, and that he used every effort in his power to have the brig speedily repaired.

I think the testimony of the libellants establishes this fact. The persons who surveyed her when she arrived, and those who repaired her, and assisted in landing her cargo, and in reshipping it, and fitting her to sail again, have been examined, and they all testify that there was no unnecessary delay; they are witnesses who testify to what they saw, and in relation to matters in which they were personally engaged; and there is nothing in the record to contradict them, or to impair their credit. It is true, when we compare the time occupied at Nassau with the time that would be occupied in similar work in Baltimore, it would appear to have been unreasonably long; but such a comparison ought not to influence the judgment of the court, because the time required must depend upon the facilities which the port affords for landing and reshipping cargo, and repairing damages; and what may be done in a few days in one port, may require a month in another. Besides, the master of the Monte Christo had the strongest inducements of interest to urge on the work as speedily as possible; he was bound to victual and man the ship at his own expense, and every day's delay brought with it a heavy charge upon him personally, for which the owners were not bound to repay him. With

such strong inducements on his part to press on the work, and with the testimony of the witnesses above mentioned, I think the libellants have sufficiently established the fact, that the long delay at Nassau was unavoidable, and occasioned by circumstances beyond their control. As to the time occupied in the voyage to Basseterre, and thence to Franklin, no objection has been taken, and the proof by the libellants is abundantly sufficient.

Tracking the brig, therefore, from the date of the charter-party to her arrival at Franklin, the court think that there was no unnecessary delay on the part of the vessel; and that reasonable and proper exertions were made to arrive at the port of shipment, within the time ordinarily occupied in the voyages described in the two charter-parties.

This being the case, and looking only to the language of the written charter-party, the unavoidable delay did not forfeit the right of the ship owners to demand cargo upon the arrival of the brig at the port of shipment. The written contract contains no stipulation on their part that the vessel shall arrive at or before a particular day; the law implies no other condition than that reasonable and proper exertions shall be made, to perform the voyages contemplated by the charter-party, as speedily as practicable; and the shipper takes the risk of delay or detention, by any superior force which the vessel could not resist or overcome; whether it be an embargo by the government, or a storm on the ocean. The case of Hadley v. Clarke, 8 Term R. 259, and the cases of Schilizzi v. Derry, 4 El. & Bl. 873, and Hurst v. Osborne, 18 C. B. 144, were decided upon this principle; and the last-mentioned case, in all its facts and circumstances, strikingly resembles the one before the court.

Neither is the omission of the brig to remain at Franklin the number of lay-days mentioned in the charter, a bar to this claim. She was there, prepared to receive cargo, gave notice of it to the agent of the respondent, and remained there until she received the answer hereinbefore mentioned; the lay-days are expressly introduced into the charter-party, to give the shipper convenient time to furnish the cargo; and when the master was informed that a cargo would not be furnished, and that the binding obligation of the contract was denied, any further delay at that port would have been a useless and improper waste of time, and of no service to any one. The principle which is so familiar in cases of insurance, applies with equal force to this; in case of a loss, the party insured is usually bound by his contract to produce his preliminary proof of loss, and the insurer is entitled to a certain number of days, after this proof, in which he is to pay the money. But if the insurer informs the assured that he denies his right to recover for the loss, and that he will not pay the money, the assured may sue at once, with-

out preliminary proof, and without waiting for the expiration of the time allowed to the insurer for paying; his refusal dispenses with the performance of the condition. And upon the same principle, the positive refusal to furnish cargo, dispenses with the obligation of waiting to receive it.

The case of Avery v. Bowden, 6 El. & Bl. 953, has been referred to as deciding a contrary principle. But that case was decided upon a very strict and narrow construction of the words used by the party; the court held that these did not amount to an absolute and positive refusal; and this is perhaps a sufficient answer to this case; yet, it is proper for me to say, that I should have put a different construction upon them, and held that they dispensed the ship-owners from any further delay, and should not follow that decision, if the words were the same in the case before me.

Upon the written contract, then, speaking for itself, I think the libellants are not entitled to recover. But evidence has been offered of an established and proven usage in this trade, which it is supposed ought to influence the construction of the charter-party; but the court see nothing in the usage proved by the testimony, which can be regarded as material in this case. Some of the witnesses say, that the known and usual season for shipping sugar and molasses from the Attakapas, in which Franklin is situated, begins in November, and ends with March; and that charter-parties for that trade are always understood to be made with reference to that season, unless otherwise specially provided; other witnesses limit the duration of the season to the first of March. But it is not easy to see how the usage of making the charter-party with reference to the season, can affect its construction. No doubt, when sugar and molasses are to be imported from Attakapas, and the charter-parties are made in other cities, they are made at a period of time when, according to the ordinary course of the voyage, the vessel will arrive at the season when these articles are usually exported from that country; this present charter-party was evidently made with reference to that season; and both parties expected at the time, that the vessel would arrive before the usual time for exportation was over. But how does that affect the construction of the written contract? None of the witnesses say that, by the usage, the ship-owner forfeits his right to the freight contracted for, if, by events beyond his control, the voyage has been protracted beyond the time contemplated by the parties; none of the witnesses say that, upon a contract of this kind, the ship-owner, by the usage, takes upon himself the risk of delay from unavoidable casualties; nor that the usage implies a stipulation on his part to arrive within the usual season for shipping; and that the performance of this stipulation is a condition precedent to his right to demand the cargo

and freight which the shipper contracts to furnish. Indeed, if even a usage to that extent had been proved by these witnesses, it could hardly be allowed to engraft a new stipulation into the contract, inconsistent with the legal construction of the written instrument. But certainly, as far as the usage is proved, none of the witnesses say that it would, in any degree, influence the construction of a charter-party like the one before the court, or affect the rights of the parties under it.

It follows from what I have said, that the refusal of the respondent to furnish a cargo, was a breach of his covenant, for which the libellants are entitled to recover damages; and the remaining question is, by what rule are these damages to be measured? If it were a suit at common law, were legal rights and legal obligations are alone the subjects of consideration, and equitable claims cannot be brought into the view of the court, the result, undoubtedly, would be, that the libellants must recover the full amount of the freight that would have been earned, if the cargo agreed on had been furnished. This was the case in the suits on the charter-parties above referred to, in the English courts; they were all suits at common law, and no equitable circumstances could, therefore, be introduced in mitigation of damages.

But this is a proceeding in admiralty, and the equity, as well as the law of the case, is before the court; and I think the omission to give notice of the disaster which detained the vessel so long at Nassau, must exercise a serious influence in estimating the damages to which the libellants are justly and equitably entitled. The proof shows that the master had frequent opportunities to give this notice. It is true, that there is no stipulation in the charter-party that the ship-owner shall give notice to the shipper of any interruption or delay in the voyage, which may be occasioned by storm or otherwise; every voyage is liable to more or less delay, from contrary winds or the dangers of the sea; and the possibilities of delays, and occasional interruptions for a few days, or even a week or two, must always be in the contemplation of the parties when a charter-party is made, and no notice of any such delay is required, unless expressly provided for by the instrument itself. But the delay in this case was entirely outside of the ordinary events of such a voyage, and is probably without example in the history of the trade. It obviously could not have been in the contemplation of either of the parties to the contract; and it was an event, therefore, for which the charter-party did not intend to provide.

Now, the master of the Monte Christo knew that the shipper would expect him to arrive in the ordinary period of such voyage; that his cargo would be prepared accordingly; that a long delay in keeping it on hand, and daily expecting this brig, might expose him to

inconvenience and loss; and that he might conclude after such a lapse of time, without hearing from her, that she was lost, or had wilfully broken the contract; and would probably, under this impression, ship all the sugar and molasses under his control, and have no cargo to ship when the brig unexpectedly arrived. With this knowledge, and knowing that such a long delay was not contemplated by either party, and on that account not provided for in the contract, good faith and justice required that he should, as soon as practicable, apprise the shipper of the event which had so unexpectedly happened, and of the probable time of his detention at Nassau. He could not, without great injustice to the shipper, withhold from him the knowledge that his voyage would be delayed nearly three months beyond the time contemplated, and leave to the shipper to conjecture the cause of this delay, and embarrass him in his shipments during all that time. The inability of the shipper to provide a cargo, was evidently occasioned by this want of notice, and the ship owners must share in the loss occasioned by their omission to perform a duty, which justice and fair dealing evidently required. On the other hand, it is equally true, that the shipper ought not to have disabled himself from fulfilling his contract, without having first sought information as to the condition of the vessel, and the cause of the unexpected delay. I am not, however, prepared at this time to say, what amount of freight would have been earned, if the cargo had been supplied; nor the precise proportion of the loss which the libellants should bear. I shall, therefore, refer the papers in the case to a commissioner, with directions to state an account, and to receive any further evidence that either party may offer to enhance or diminish the damages. It will be remembered, however, that the testimony of Captain Wood is not in the case, he being an incompetent witness.